Cyndia **KENNEDY–MCINNIS, Lejune Kennedy, Carolyn Kennedy–Green, Ernest Kennedy, Brant Kennedy, Donna Mattern, Robert Nenno, Laurie Stathopoulos, Jill Wirth, Virginia Jacobson, Rolann Bailey, Shauna Clay and John Yeager on behalf of themselves and all persons similarly situated, Plaintiffs,**

v.

**BIOMEDICAL TISSUE SERVICES, LTD., Michael Mastromarino, Serenity Hill's Funeral Home Inc., Thomas E. Burger Funeral Home Inc., Profetta Funeral Home, Regeneration Technologies Inc., LifeCell Corporation, Tutogen Medical Inc., Blood & Tissue Center of Central TX, and Lost Mountain Tissue Bank, Defendants.**

13–CV–6545
06–CV–6410

United States District Court,
W.D. New York.

Signed April 11, 2016

Robert J. McGuirl, Law Offices of Robert J. McGuirl, Park Ridge, NJ, Edmond C. Baird, Kevin J. English, Phillips Lytle LLP, Buffalo, NY, Joseph A. D'Avanzo, D'Avanzo & Morreale, P.C., White Plains, NY, Joseph T. Perkins, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Albany, NY, Denise Brinker Bense, Cozen O'Connor, West Conshohocken, PA, for Defendants.

## DECISION & ORDER

### HON. DAVID G. LARIMER, UNITED STATES DISTRICT JUDGE

This case arises out of the alleged unlawful "harvesting" of human body parts and tissues from corpses that were entrusted to certain funeral homes in the Rochester, New York area. Plaintiffs, who are family members of the decedents in question, allege that the defendants were involved in handling the decedents' bodies or body parts, and that they acted without the prior consent or knowledge of plaintiffs or their decedents. Subject-matter jurisdiction in this Court is premised on diversity of citizenship under 28 U.S.C. § 1332.

Two motions are now pending before the Court. Defendant Regeneration Technologies Inc. ("RTI") has moved for summary judgment (Dkt.# 72). Plaintiffs have cross-moved for summary judgment (Dkt.# 77). For the reasons that follow, defendant's motion is granted, plaintiffs' motion is denied, and the complaint is dismissed.

## PROCEDURAL HISTORY

Five of the plaintiffs filed a lawsuit on March 7, 2006, against three defendants: Biomedical Tissue Services, Ltd. ("BTS"), BTS's owner Michael Mastromarino ("Mastromarino"), and "Serenity Hill's [sic] Funeral Home, Inc." ("Serenity

Van Henri White, Law Office of Van White, Rochester, NY, for Plaintiffs.

Hills."). Those five plaintiffs, all of whom were children of decedent Lottie Ann Warren–Kennedy, alleged in the original complaint that after their mother died, they committed her remains to Serenity Hills for cremation. They further alleged that without their consent, Serenity Hills allowed BTS, which is a human-tissue recovery firm, to harvest some of the decedent's body tissues, prior to cremation. 06–CV–6140 Dkt. # 1. Apparently those body parts had some monetary value, primarily for later transplantation into living persons.

The amended complaint, filed on March 29, 2006, added seven more plaintiffs, all of whom are survivors of five decedents. 06–CV–6140 Dkt. # 2. Ten defendants were named in the amended complaint, including RTI. The other defendants comprise two other funeral homes and five "tissue banks," which allegedly received human body parts from BTS. RTI is one of those tissue banks.

The allegations of the amended complaint roughly parallel those of the original complaint. According to the amended complaint, the remains of plaintiffs' decedents were entrusted to various funeral homes in the Rochester area. The funeral homes allegedly allowed BTS to harvest body parts from the decedents' bodies, without the prior knowledge or consent of the plaintiffs or the decedents.

Following the "harvesting," BTS allegedly supplied the body parts to several tissue banks, including RTI. The amended complaint alleges that the tissue banks failed to properly screen the body parts for proper consent and authorizations, as required by law. Dkt. # 2 ¶ 34.

On January 16, 2007, the case was transferred to the Judicial Panel on Multidistrict Litigation ("MDL panel"), for inclusion in coordinated proceedings with two related cases from other districts, involving similar allegations. 06–CV–6140 Dkt. # 52.

On November 13, 2007, District Judge William Martini, who was overseeing those coordinated proceedings, granted summary judgment in favor of two of the tissue banks, Tutogen Medical, Inc. and Blood and Tissue Center of Central Texas. Judge Martini based his decision on lack of standing, because plaintiffs had not established that those defendants had received any body parts from plaintiffs' decedents. 13–CV–6545 Dkt. # 30.

The claims against defendant LifeCell, another tissue bank, were dismissed by stipulation of the parties on July 28, 2010. 13–CV–6545 Dkt. # 49. Another defendant, Lost Mountain Tissue Bank, has never appeared in this action, and according to its former counsel, Lost Mountain Tissue Bank has entered into Chapter 7 bankruptcy proceedings and is dissolved. Dkt. # 67.

Defendants BTS, Mastromarino, and Serenity Hills have likewise never appeared in this action. Mastromarino was eventually indicted and pleaded guilty to fraud and other criminal charges in New York and Pennsylvania. He was sentenced to lengthy terms in prison, and he was still serving his sentences at the time of his death in July 2013.

On September 30, 2013, the case was remanded to this Court. Dkt. # 52. That remand was effected pursuant to an order to show cause issued by Judge Martini, in which he stated that of the 421 related cases that had been before him, all but four had been settled. 13–CV–6545 Dkt. # 50. The case at bar is one of those cases that remained unresolved as of the date of that order. The only remaining defendant in this case is RTI.

In a decision issued prior to that remand order, Judge Martini did address plaintiffs'

claims against RTI. On November 14, 2007, Judge Martini denied a motion for summary judgment by RTI (and by Life-Cell and Lost Mountain), based on the New York Anatomical Gift Act, N.Y. Pub. Health L. §§ 4300–4309. That act provides, with respect to a claim against a recipient of human tissue, that "[a] person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." Pub. Health L. § 4306(3).

In his decision, Judge Martini stated that "summary judgment in favor of [RTI] at this time would be premature without further discovery." 13–CV–6545 Dkt. # 29 at 7. He added that the consent forms submitted by RTI "appear[ed] to be facially valid," but that summary judgment would be premature because there had not yet been any discovery on RTI's knowledge that the forms were fabricated, or regarding evidence suggesting that the forms may have been invalid. *Id.* at 12. Following that decision, and pursuant to Judge Martini's request, the MDL Panel remanded the case back to this Court. *See* Dkt. # 51, # 52.

Following that remand, counsel for both sides filed a "Joint Statement" (Dkt.# 61) stating that "[t]here has been full and timely compliance with the disclosure requirements of Federal Rules of Civil Procedure 26," and that both sides wished the Court to set a trial date. They subsequently filed their motions for summary judgment. To the extent that Judge Martini's decision was based on the need for discovery, then, that is no longer an issue, based on the parties' joint statement. There has been more than enough time—several years—to conduct discovery since Judge Martini's decision.

## DISCUSSION

### I. "Mishandling and Desecration of a Body"

Plaintiffs have asserted two claims against RTI, which are denominated as the second and sixth claims of the complaint overall. In the first of those two claims, plaintiffs allege that defendants "intentionally harvested decedents' body parts without the prior consent of decedent or the consent of decedent's next of kin." Dkt. # 2 ¶ 99. The precise nature of this claim is not well articulated.

At oral argument, plaintiffs' counsel suggested that this claim is based on federal regulations governing the recovery and use of human tissue intended for transplantation or other medical purposes. *See* 21 C.F.R. Parts 1270, 1271. Those regulations set forth extensive requirements for record-keeping and other procedures that must be followed with respect to body-parts donations.

But neither the regulations nor the Public Health Service Act, 42 U.S.C. § 201 *et seq.*, pursuant to which those regulations were promulgated, purport to give rise to a private right of action, much less a right of action to recover damages for "mishandling and desecration of a body." This cause of action appears to be nothing but a duplicative restatement of the sixth cause of action, which sounds in negligence.

### II. Negligence

#### A. General Principles

In their negligence claim, plaintiffs allege that RTI "had a duty to ensure the authenticity of the consent forms that were provided [to RTI] with the harvested body parts received from [BTS]." Dkt. # 2 ¶ 115. Plaintiffs allege that RTI "failed to take the necessary steps to ensure that proper consents were obtained for the har-

vesting of decedents' body parts." *Id.* ¶ 116.

■ It is axiomatic that there can be no claim for negligence in the absence of a duty of care, running to the injured party. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996). *See Lauer v. City of New York*, 95 N.Y.2d 95, 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000) ("Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm"); *Pulka v. Edelman*, 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976) ("In the absence of duty, there is no breach and without a breach there is no liability"). The existence and scope of a duty is an issue of law for the court to determine. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001); *Eiseman v. State of New York*, 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987).

As the basis for a cognizable cause of action, then, negligence is not to be equated with mere carelessness. It is not enough that the defendant did something that was, in the abstract sense, negligent; the alleged negligence must have violated a duty owed to the plaintiff. As then-Chief Judge Cardozo stated in the seminal case of *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341, 162 N.E. 99 (1928), "[p]roof of negligence in the air, so to speak, will not do."

■ Nor is negligence to be confused with foreseeability. Foreseeability, while a component of a negligence claim, does not determine the existence of duty, but, rather, the scope of that duty once it is determined to exist. *Eiseman v. State of New York*, 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987); *Pulka*, 40 N.Y.2d at 785, 390 N.Y.S.2d 393, 358 N.E.2d 1019.

**B. Right of Sepulcher**

Before analyzing plaintiffs' negligence claim, the Court must address the common-law "right of sepulcher." Although plaintiffs have not expressly pleaded a sepulcher claim, right-of-sepulcher cases have been described as "a subset of negligence causes of action." *Drever v. State*, 45 Misc.3d 224, 231, 984 N.Y.S.2d 550 (Ct. Claims 2014), *modified on other grounds*, 134 A.D.3d 19, 18 N.Y.S.3d 207 (3d Dep't 2015). In addition, both plaintiffs and defendants in this case have addressed plaintiffs' negligence claim in terms of sepulcher claims.

■ "The common-law right of sepulcher affords the deceased's next of kin an 'absolute right to the immediate possession of a decedent's body for preservation and burial ..., and damages may be awarded against any person who unlawfully interferes with that right or improperly deals with the decedent's body.'" *Shipley v. City of New York*, 25 N.Y.3d 645, 653, 16 N.Y.S.3d 1, 37 N.E.3d 58 (2015) (quoting *Mack v. Brown*, 82 A.D.3d 133, 137, 919 N.Y.S.2d 166 (2d Dep't 2011)). *See also Melfi v. Mount Sinai Hosp.*, 64 A.D.3d 26, 31, 877 N.Y.S.2d 300 (1st Dep't 2009) (right of sepulcher "gives the next of kin an absolute right to the immediate possession of a decedent's body for preservation and burial").

■ "Damages [for interference with the right of sepulcher] are awarded as compensation to the next of kin for the 'solely emotional injury" experienced as a result of the interference with their ability to properly bury their decedent." *Rugova v. City of New York*, 132 A.D.3d 220, 229, 16 N.Y.S.3d 233 (1st Dep't 2015) (quoting *Melfi*, 64 A.D.3d at 32, 877 N.Y.S.2d 300). But "[b]ecause the right of sepulcher is premised on the next of kin's right to possess the body for preservation and burial (or other proper disposition), and is

geared toward affording the next of kin solace and comfort in the ritual of burying or otherwise properly disposing of the body, it is the act of depriving the next of kin of the body, and not the deprivation of organ or tissue samples within the body, that constitutes a violation of the right of sepulcher." *Shipley*, 16 N.Y.S.3d 1, 25 N.Y.3d at 653–54.

## C. Application to this Case

In support of its motion for summary judgment, RTI contends that based on plaintiffs' allegations, the only claim that could be cognizable here would be based on the right of sepulcher. RTI contends that it cannot be held liable under that theory, because any interference with plaintiffs' right of sepulcher was complete before RTI came into contact with the decedents' body tissue.

■ As stated, plaintiffs have not expressly pleaded such a claim in the complaint, although plaintiffs do contend in their motion papers that they have such a claim, *see* Dkt. # 81 at 10. That assertion appears to be little more than an afterthought, which plaintiffs have asserted in response to defendants' motion. Although the Court is under no obligation to scour the complaint to determine whether plaintiffs could have pleaded a claim under this, or any other unpleaded theory, I conclude that in any event, they have not pleaded a facially valid sepulcher claim.

Rather astoundingly, plaintiffs have not even cited *Shipley*, in which the New York Court of Appeals expressly held that the deprivation of organ or tissue samples within a decedent's body does not in itself constitute a violation of the right of sepulcher. Plaintiffs instead rely primarily on the Appellate Division decision in *Melfi*. But while *Melfi* contains an extensive discussion of the right of sepulcher, and apparently remains good law, it does not help plaintiffs in this case.

The court in *Melfi* stated that "for a right of sepulcher claim to accrue 1) there must be interference with the next of kin's immediate possession of decedent's body and 2) the interference has caused mental anguish, which is generally presumed. Interference can arise either by unauthorized autopsy, or by disposing of the remains inadvertently, or ... by failure to notify next of kin of the death." 64 A.D.3d at 39, 877 N.Y.S.2d 300 (citations omitted). Such interference is not alleged here.

More to the point, nothing in *Melfi* contradicts or is inconsistent with the Court of Appeals' holding in *Shipley* that the unauthorized removal of organs or tissue samples, apart from the particular circumstances recited above, does not amount to a violation of the right of sepulcher. In any event, *Shipley* is more recent, was decided by a higher court, and is more directly on point here than *Melfi*. In short, it is *Shipley* that controls. And under *Shipley*, I find that plaintiffs have not stated a valid claim for interference with the right of sepulcher.

■ Nor do I see any other basis for plaintiffs' negligence claim. In support of that claim, plaintiffs allege that RTI "contractually created a duty to monitor the operations of Defendants Mastromarino and BTS." They further allege that RTI's contracts with BTS "gave rise to a duty to audit and inspect in order to be in compliance with the higher standards enunciated by the American Association of Tissue Banks (AATB)." Dkt. # 81 at 9.

In support of that argument, plaintiffs cite another pre-*Shipley* case, *In re Human Tissue Litigation*, 38 Misc.3d 184, 955 N.Y.S.2d 721 (Sup.Ct.Richmond County 2012) ("*Human Tissue*"). In that case, which involved claims against Mastromarino, RTI, and Tutogen, the court held that there were fact issues on a sepulcher claim involving RTI and Mastromarino, based on

evidence (1) that RTI had contractually reserved a right to "audit/inspect" Mastromarino's operation annually, and (2) that RTI was aware of Mastromarino's questionable character, based on his past criminal history, which included convictions for drug-related convictions, unlawful use of a police uniform or emblem, and practicing dentistry without a license. There was evidence that outside counsel had warned RTI that Mastromarino "ha[d] been on Santa's naughty list for quite some time," and that counsel "strongly encourage[d]" RTI not to do business with him. 38 Misc.3d at 187, 955 N.Y.S.2d 721.

For several reasons, the decision in the *Human Tissue* case does not lead me to a different result here. For one thing, the court in that case analyzed the plaintiffs' claim not as a pure negligence claim, but as a sepulcher claim. *See id.* at 199, 955 N.Y.S.2d 721 (stating that "right of sepulcher cases are a subset of negligence actions"). As stated, I see no basis for such a claim here.

The court further held that there is no common-law duty on the part of tissue banks to audit or inspect their suppliers, but that such duty arises by virtue of the "intricate series of laws" enacted in New York to regulate human tissue collection and distribution. *Id.* at 200, 955 N.Y.S.2d 721. The court went on to dismiss the plaintiffs' negligence claims as duplicative of their sepulcher claims. *Id.* at 202, 955 N.Y.S.2d 721.

As noted, however, the New York Court of Appeals has since held in *Shipley* that there is no cause of action for loss of the right of sepulcher, based on the unauthorized removal of body tissues or organs. That holding is more restrictive than the broad statements in *Human Tissue* that "[t]he right of sepulcher permits the next of kin the right to recover for solely emotional damages which may arise as a result of interference with their loved one's body after death," *id.* at 190, 955 N.Y.S.2d 721, and that the right of sepulcher imposes "a duty to the next of kin of the decedents to treat their loved ones' bodies with respect." *Id.* at 192, 955 N.Y.S.2d 721. *Shipley* is a more recent decision, from the highest New York court, and to the extent that *Shipley* and *Human Tissue* can be read as inconsistent with each other, this Court will follow *Shipley*.

The court in the *Human Tissue* case also noted that RTI "specifically reserved the right to 'audit/inspect' Mastromarino's operation" once a year. *Id.* The court held that by agreeing to those provisions, the defendants "placed a burden upon themselves that is beyond that which is normally required in the tissue processing industry," and that the contract "gave rise to a duty to audit and inspect in order to be in compliance with the higher standards enunciated by the American Association of Tissue Banks (AATB)." *Id.* at 193, 955 N.Y.S.2d 721.

In the case at bar, the evidence shows that the parties agreed that RTI would conduct "[a]nnual audits of BioMedical of compliance requirements for handling human tissue donations," that BTS would provide proof both of its current "licensure/registration with applicable state and federal agencies" and that BTS remained accredited by, or met the standards of, the AATB, and that BTS would provide RTI with access to its records for inspection and auditing purposes. Dkt. # 79–8 at 5.[1]

---

1. In a footnote in its reply brief, RTI contends that the contract was entered into not by RTI, but by "RTI Donor Services, Inc.," which is a separate entity and has never been named in this lawsuit. Dkt. # 84 at 11 n.4. The relationship between RTI and RTI Donor Services has not been fully laid out here, and in light of the Court's rulings in this Decision and Order, I find it unnecessary to address that matter.

In the *Human Tissue* case, the court concluded that the contract between RTI and BTS "gave rise to a duty to audit and inspect in order to be in compliance" with AATB standards. 38 Misc.3d at 193, 955 N.Y.S.2d 721. Perhaps so, but the operative question here is to whom that duty was owed.

To the extent that these provisions imposed any duties on RTI, I conclude that this does not aid plaintiffs in the case at bar. Plaintiffs were not parties to the contract between RTI and BTS, nor have they provided proof that they were intended beneficiaries of the agreement. *See City of Amsterdam v. Lam*, 270 A.D.2d 603, 605, 703 N.Y.S.2d 606 (3d Dep't 2000) (plaintiff asserting negligence claim based on third-party beneficiary theory had burden of demonstrating that contracting parties intended to confer enforceable rights upon the plaintiff). If anything, those provisions seem to have been intended solely to benefit RTI., to provide with some means of assuring itself that BTS was operating in a legitimate fashion.

There is no evidence, however, that plaintiffs, who were not parties to the contract and who did not deal directly with RTI, were even aware of these contractual provisions, much less that they relied on them. Plaintiffs have presented no proof that RTI held itself out to the public in general, or to plaintiffs in particular, as in compliance with AATB standards. *See Espinal v. Melville Snow Contractors, Inc.*, 283 A.D.2d 546, 546, 724 N.Y.S.2d 893 (2d Dep't 2001) (directing dismissal of personal-injury claim in part because plaintiff failed to raise a triable issue of fact as to whether she detrimentally relied on defendant's performance of its contractual obligations with her employer).

I also note that the evidence relied on by the court in the *Human Tissues* case related generally only to indications that Mastromarino was "a person of questiona-ble character...." 38 Misc.3d at 192, 955 N.Y.S.2d 721. Plaintiffs have not presented evidence that RTI knew or should have known that Mastromarino or BTS was providing it with unlawfully obtained body parts. In fact, Mastromarino himself admitted at his plea colloquy that he had falsified various records, including consent forms, to make it appear, fraudulently, that he and BTS were in full compliance with the law. *See* Dkt. # 72-8, at 19–20. Those consent forms have been held to be facially valid under New York law. *In re Human Tissue Products Liab. Litigation*, MDL No. 1763, 2007 WL 3510752, at *4 (D.N.J. Nov. 13, 2007). There is no evidence, then, that RTI should have questioned the authenticity of those forms, or that any alleged failure on the part of RTI to ensure BTS's compliance with the law was a proximate cause of plaintiffs' alleged harm.

### III. Uniform Anatomical Gift Act

Defendants also rely on the good-faith exception of the Uniform Anatomical Gift Act ("UAGA" or "Act"), N.Y. Pub. Health L. § 4300 *et seq.* That act establishes "duties of hospital administrators, organ procurement organizations, eye banks and tissue banks." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 54, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006). The UAGA is intended to serve several competing interests, including "the wishes of the deceased during his lifetime concerning the disposition of his body[,] ... the desires of the surviving spouse or next of kin[,] ... and ... the need of society for bodies, tissues and organs for medical education, research, therapy and transplantation." *Id.* at 53–54, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citation omitted).

The UAGA provides that a donee shall not accept a body part in certain circum-

stances, including "where the donee has actual notice of contrary indication by the decedent," "where the donor has not properly executed an organ donor card, driver's license authorization to make an anatomical gift, ..., registered in the New York state organ and tissue donor registry ..., or otherwise given written authorization for organ or tissue donation," or where "the donee has reason to believe that an anatomical gift is contrary to the decedent's religious or moral beliefs." N.Y. Pub. Health L. § 4301(5)(b) (formerly contained at § 4301(3)).[2]

The UAGA also contains a good-faith immunity provision. Specifically, the Act states that a "person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." N.Y. Pub. H.L. § 4306(3). As the New York Court of Appeals has explained, this provision "was intended to help increase the organ supply by encouraging medical professionals to participate in the organ procurement process." *Colavito*, 8 N.Y.3d at 55, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citing *People v. Bonilla*, 95 A.D.2d 396, 404–05, 467 N.Y.S.2d 599 (2d Dep't 1983)).

Plaintiffs have not asserted a claim under the UAGA, and the Court need not decide whether they could. *See Colavito*, 8 N.Y.3d at 56–57, 827 N.Y.S.2d 96, 860 N.E.2d 713 (holding that on the facts of that case, organ donee did not have a right of action under the UAGA). But if the

facts of this case fall within the parameters of the UAGA's good-faith provision, that provision clearly bars all the claims asserted in this suit; the statute does not simply bar suits under the Act itself, but provides complete immunity "for damages in *any* civil action" within its scope. (Emphasis added.) *See Rahman v. Mayo Clinic*, 578 N.W.2d 802, 805 (Minn.App.1998) (UAGA's good-faith provision "provides immunity *from suit*, not simply a defense to liability").

 Plaintiffs contend that whether the good-faith exception applies here presents an issue of fact. On the record before me, however, I find that there are no genuine issues of material fact, and that defendants are entitled to summary judgment on this ground as well.

In support of their motion, plaintiffs cite *Nunez v. New York Organ Donor Network, Inc.*, 92 A.D.3d 594, 939 N.Y.S.2d 368 (1st Dep't 2012). All the court held in *Nunez*, however, was that the evidence before it "present[ed] no issue of fact whether defendant failed to act in good faith in connection with its efforts to obtain the necessary statutory consent for the subject organ donation." *Id.* at 594, 939 N.Y.S.2d 368. The court therefore dismissed all of the plaintiffs' claims, including those alleging a violation of the UAGA.

As *Nunez* demonstrates, to defeat a motion for summary judgment, it is not enough simply to say that a particular matter presents an issue of fact, in the abstract. On a motion for summary judg-

---

**2.** Plaintiffs incorrectly cite this provision as § 4306(3), which contains the good-faith exception discussed below. *See* Dkt.. # 81 at 4. In fact, plaintiffs make that mistake twice in a row. In support of their statement that a "number of the provisions" of the UAGA apply here, plaintiffs state, "First," that § 4306(3) requires written authorization from the donor. The next paragraph states, "Second," that § 4306(3) requires written authori-

zation from the donor. Dkt. # 81 at 4. Both paragraphs (mis)cite the same provision, and quote the exact same language, which, as stated, is actually contained not in § 4306, but in § 4301.

I also note that plaintiffs incorrectly state in their brief that the *Espinal* decision was issued by the New York Court of Appeals, *see id.* at 9, whereas it was in fact issued by the Appellate Division, Second Department.

ment, the dispositive question is not simply whether the motion requires resolution of issues of fact, but whether the evidence in the record gives rise to a genuine issue of material fact; in other words, whether the evidence is so one-sided that the court can appropriately resolve all the material factual issues.

I conclude that the Court can do so here. The evidence submitted by plaintiffs shows, at most, that RTI was told by its attorney that it would not "make[ ] good business sense to continue in a relationship with someone with a background like Dr. Mastromarino...." Dkt. #79-10 at 2. RTI failed to heed that advice, undoubtedly to its regret. But there is no evidence upon which a finder of fact could determine that RTI should have suspected that Mastromarino was faking the requisite consent forms for body parts or tissues, or that RTI acted in less than good faith in accepting those body parts pursuant to its contract with BTS.

I reach that conclusion based on an interpretation of the UAGA that has been widely accepted by courts nationwide, beginning with a decision by a New York state court. As explained by the Massachusetts Supreme Court, "[t]he majority of ... courts interpreting the term 'good faith' in the UAGA have adopted the definition provided by *Nicoletta v. Rochester Eye & Human Parts Bank, Inc.,* 136 Misc.2d 1065, 1067–68, 519 N.Y.S.2d 928 (Sup.Ct. Wayne County 1987)." *Carey v. New England Organ Bank,* 446 Mass. 270, 282, 843 N.E.2d 1070 (2006). "Good faith is defined in this context ... as an honest belief, the absence of malice, or the absence of a design to defraud or to seek an unconscionable advantage over another." *Id.* (citing *Nicoletta*).

The court in *Nicoletta* stated that in enacting § 4306(3), "the Legislature has created an objective standard by which the good faith of a donee could be measured.

The Uniform Anatomical Gift Act establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the circumstances under which such a gift must be deemed null and void." 136 Misc.2d at 1069, 519 N.Y.S.2d 928.

Applying that standard, the court in *Carey* held that "where a defendant moving for summary judgment contends, and makes at least a minimal showing, that it acted in good faith within the meaning of [the UAGA], the burden falls to the plaintiffs to identify competent evidence sufficient for a reasonable jury to find to the contrary." 446 Mass. at 283, 843 N.E.2d 1070. Similarly, a Missouri appellate court has held that "the good faith determination under the UAGA is a question of law which can be addressed on summary judgment," and that a defendant can be found to "have acted in good faith under the UAGA, and thus granted immunity from civil liability, despite flaws with obtaining consent or in erroneously completing the consent form." *Schembre v. Mid–America Transplant Ass'n,* 135 S.W.3d 527, 532 (Mo.Ct.App.2004). *See also Rahman,* 578 N.W.2d at 805 ("Whether actions constitute good faith [under the UAGA] is a question of law, properly resolved on summary judgment"); *Brown v. Delaware Valley Transplant Program,* 420 Pa.Super. 84, 93, 615 A.2d 1379 (1992) (citing *Nicoletta* and concluding that the undisputed facts established hospital's good faith as matter of law); *Kelly–Nevils v. Detroit Receiving Hosp.,* 207 Mich.App. 410, 417, 526 N.W.2d 15 (1994) ("Following the lead of the New York and Pennsylvania courts, we also hold that the question of good faith under the UAGA is properly a matter of law for the court").

RTI has presented evidence that it acted in good faith, and plaintiffs have not rebut-

ted that showing with evidence from which a factfinder could conclude otherwise. The evidence shows that RTI had been warned that Mastromarino had a checkered past, and that it would make good business sense for RTI to avoid pursuing a relationship with him. *See* Dkt. # 79–9 at 2, # 79–10 at 2. But that is a far cry from saying that RTI had reason to think that the consent forms supplied to it by BTS were fraudulent. As stated, Mastromarino admitted faking the forms, which appeared valid on their face, with the intent to defraud RTI and the other tissue banks. He apparently succeeded in doing so, but that does not indicate that RTI acted other than in good faith.[3]

The UAGA creates an objective standard by which to measure a defendant's good faith. *See Andrews v. Alabama Eye Bank,* 727 So.2d 62, 65 (Ala.1999) ("The UAGA, unlike previous cases dealing with whether one has acted in good faith, establishes a definitive standard by which to judge a donee's conduct") (citing *Nicoletta,* 136 Misc.2d at 1068–69, 519 N.Y.S.2d 928). Therefore, "[i]f the record on summary judgment ... reveals no genuine issue of material fact concerning compliance with the UAGA's requirements, then summary judgment should be entered for the party asserting good faith." *Geary v. Stanley Med. Research Inst.,* 939 A.2d 86, 92 (Me. 2008). Based on the evidence before me, I find no such factual issues to exist, and I conclude that RTI is immune from suit under the good-faith provision of the UAGA.

IT IS SO ORDERED.

## CONCLUSION

Defendant Regeneration Technologies, Inc.'s motion for summary judgment (Dkt.# 72) is granted, plaintiffs' motion for

---

**3.** I also note that there has been no jury demand here. Thus, the Court's decision

summary judgment (Dkt.# 77) is denied, and the complaint is dismissed.

does not implicate the role of the jury.